Litwinowitch, Appellant, *v.* Oriental
Navigation Co.

Argued April 20, 1933. Before Frazer, C. J., Simpson, Schaffer, Drew and Linn, JJ.

258

*Leslie C. Krusen,* with him *Allen Spangler,* for appellant.—A verdict having been found for the plaintiff by the jury, the testimony must be read in the light most advantageous to plaintiff; that all conflicts therein must be resolved in his favor; and that he must be given the benefit of every fact, and inference of fact, pertinent to the issues involved, which may reasonably be deduced from the evidence: Bowser v. Light, Heat & Power Co., 267 Pa. 483.

Where the general control of a property is retained by the owner he is obligated to keep the premises in such condition that lawful invitees will not be injured: Henry v. Wanamaker, 45 Pa. Superior Ct. 346; Fredericks v. Atlantic Ref. Co., 282 Pa. 8; Papilios v. Mfg. Co., 58 Pa. Superior Ct. 70.

The owner of the premises is held liable where he or his servant participated in the work of the contractor, or had a measure of control: Gilmore v. R. R. Co., 154 Pa. 375; Foster v. Steel Co., 216 Pa. 279.

*Thomas F. Mount,* with him *Rawle & Henderson,* for appellee.—The ship owner is not liable for injuries to employees of an independent contracting stevedore: Luchenbach Steamship Co. v. Buzynski, 19 Fed. (2d) 871.

OPINION BY MR. JUSTICE SIMPSON, May 22, 1933:

Plaintiff sued to recover damages for personal injuries sustained while assisting in unloading the steamship Oriole, owned and operated by defendant. The jury rendered a verdict for plaintiff, the court in banc entered judgment for defendant non obstante veredicto, and

plaintiff appeals. In determining whether or not the judgment is correct, we must resolve in favor of plaintiff, all doubts on questions of fact, whether directly arising out of the evidence actually produced or only properly deducible therefrom; but, even after doing so here, we think the judgment must be sustained. Marshalled according to that rule, the facts are as follows:

In the latter part of 1927, the steamship was loaded at ports on the Pacific coast, with freight to be delivered at Atlantic ports. Most of the cargo was rough lumber—that is, lumber just as it came from the saw mill—of varying lengths, widths and thicknesses. It occupied all of the vessel below the between-deck, and some forty thousand feet in addition was piled on the upper deck. It was loaded under an independent contract with a master stevedore, who had sole charge of the work and of the various appliances used for the purpose.

There are two commonly-used methods of loading such lumber. The first is what is known as the "stripping method," that is, over each fourth or fifth level of the lumber being loaded, narrow strips of wood are placed, so that the next level shall rest on the strips and not directly on the lumber immediately below. The other is the "overlapping method," that is, the lumber on each level overlaps the joints of the lumber immediately below, just as bricks are laid in construction work, so that each tier, from the top to the bottom of the stowage, shall hold together the tier next below it. The second method was the one adopted in the instant case. Which is the best may be disputable, but, in the absence of some knowledge or information to the contrary—which does not appear,—the ship had the right to rely on the decision of the master stevedore, who, like all others in his class, was, as appellant admits in his brief, "an expert and specialist on the question of handling cargoes." For the officers of the ship to have substituted their judgment for that of the master stevedore, would have been for inexpertness to have overridden expertness, and

would have reduced the stevedore from an independent contractor to a mere employee: Simonton v. Morton, 275 Pa. 562, 569; Weaver v. Foundation Co., 310 Pa. 310, 314-15. The ship's officers continued in general charge of the ship, of course, but there is neither evidence nor presumption that they interfered with the loading, or that they, or any of them, in fact knew which method was the better, or which one was used. That their reliance was justified, is strongly borne out by the fact that, on the winter trip from the Pacific ports to those on the Atlantic, and down to the time of the happening of the regrettable accident now being considered, it does not appear that anything occurred to raise a doubt or uncertainty regarding the propriety of their reliance on the expert knowledge of the master stevedore.

After all the other cargo had been delivered at the Atlantic ports to which it was consigned, the Oriole docked at a wharf in Philadelphia, for the purpose of having the lumber unloaded by and under the control of the Jarka Corporation, an independent contracting stevedore company, regularly engaged in this kind of work. So far as appears, everything connected with the ship and cargo was then in good shape for the doing of the work, and thereafter all that was done, in the matter of unloading, was done by the Jarka Corporation, without any interference, advice or assistance from the officers of the ship. At that time the place to work was a safe one, and, in the absence of some future act or neglect of the ship, neither of which appears, it was the duty of the Jarka Corporation, and not of the ship, to see that it continued so until the unloading was completed.

Plaintiff and the other stevedores commenced their work about 7 a. m., and the accident happened shortly after the noon hour. The lumber on deck was taken off the ship and piled on the wharf, and then the hatch was opened, in order that the lumber in the hold might be brought up and landed. After about seven and one-half feet in depth, immediately below the opening of the

hatch, had been taken out, and while plaintiff was putting a sling around another batch of lumber preparatory to its being hauled up to the deck, an adjoining tier of lumber, composed of planks two inches thick by ten inches wide, fell on him and caused the injury of which he complains. He alleges that the fall was due to a combination of two causes, for both of which, he says, defendant was responsible: (1) A two-foot list of the ship from side to side, which had existed all the time the stevedores had been on the ship; and (2) The fact that the lumber was not loaded by the stripping method.

The weight of the evidence as to the alleged listing was with the defendant, especially since, as was testified by the ship's officer in charge, the clinometer showed there was no list. As there was evidence to the contrary, however, we must give plaintiff the benefit of the doubt; but, in doing so, we are not required to ignore entirely the limiting evidence of his own witnesses, nor the undisputed physical facts. The ship was 54 feet wide and the list was said to be about 2 feet, which means that the planks which fell were but three-eighths of an inch out of level—less than half the thickness of an ordinary board. Plaintiff's principal witness said that, in unloading lumber, it is difficult to prevent a list, that a slight deviation from level makes but a very slight practical difference, and, while a two-foot list may be dangerous, it is not unusual. Evidently this witness thought that any list carries with it an element of danger, but he does not say, nor even intimate, that as slight a one as this would have any effect in causing a pile of lumber to fall. If there was evidence that the ship had been rocking, despite the fact that it was tied to the wharf, it would be understandable how even rough lumber might slide and fall, though the ship was only slightly listed; but there is no evidence of rocking. Taking the evidence on this point in its entirety, the utmost that can be made out of it, favorable to plaintiff, is that, if there is any list of a

vessel carrying lumber piled without stripping, it would be more apt to fall than if it were "stripped."

Plaintiff's theory of liability based on the absence of stripping, has even less justification. Substantially it is this: It is dangerous to load lumber on shipboard without stripping it. Defendant knew this load was not stripped, because one of its officers was in charge of the vessel at the time the loading was done. It was bound to give to the stevedore and his employees a safe place to work. The hold of a ship filled with unstripped lumber is not a safe place to work. Because of this, the lumber fell and injured plaintiff. Therefore defendant is liable to him. The facts and the legal principles involved, however, furnish no basis for this argument. As we have already pointed out, it is a debatable question whether stripping was even as safe as overlapping, and this the officers of the ship were not required to decide at their peril. That the latter method was frequently used, and the expert stevedore adopted it as the best method, excludes the idea of negligence by defendant: McGeehan v. Hughes, 223 Pa. 524.

Moreover, as already stated, there is neither proof nor presumption that any one connected with the ship knew that the lumber was loaded without stripping. The evidence leaves in doubt the question whether or not plaintiff and the other stevedores, who were unloading the ship, could see, while engaged in that work, whether there was stripping between the layers of the lumber; certainly, those in charge of the ship, not being in the hold, could not see and presumably did not know, during the unloading, whether or not there was such stripping.

On a review of the whole case we find nothing, therefore, to justify a conclusion that defendant neglected any duty which it owed to plaintiff, and hence

The judgment of the court below is affirmed.